**ALICIA LEDUC MONTGOMERY, OSB 173963**
Email: alicia@leducmontgomery.com
**LEDUC MONTGOMERY LLC**
2210 W Main Street, Suite 107-328
Battle Ground, Washington 98604
Telephone: (704) 702-6934
**www.leducmontgomery.com**

**JESSE MERRITHEW, OSB 074564**
Email: jesse@lmhlegal.com
**LEVI MERRITHEW HORST P.C.**
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
**www.lmhlegal.com**

Attorneys for Plaintiff Keviante Hill

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **KEVIANTAE HILL,**<br><br>        **Plaintiff,**<br><br>vs.<br><br>**LANE COUNTY**, an Oregon government agency, **LANE COUNTY SHERIFF'S MOUNTED POSSE**, an Oregon domestic nonprofit corporation, **LANE COUNTY FAIR BOARD**, an Oregon public agency, **IRON SHIELD, LLC**, a former Oregon limited liability company, **STEVE EGERET**, an individual, **LEVI MCKENNY**, an individual, **BYRON TRAPP**, an individual, and **DOE 1**, an individual.<br><br>        **Defendants.** | Case No. 6:25-cv-01290<br><br>**COMPLAINT**<br><br>Violations of 42 U.S.C. § 1983 – Fourth Amendment Unlawful Search and Seizure, Fourth Amendment Excessive Use of Force, *Monell* Liability; Violations of ORS 30.198 – Bias Crime; Battery; Assault; Negligence Per Se; Negligence<br><br>**DEMAND FOR JURY TRIAL** |

PAGE 1 – **COMPLAINT**

## INTRODUCTION

1.      This case is about a violent, racially motivated assault on a young Black man by armed civilians in cowboy costumes operating under the authority of law enforcement during the Lane County Fair. On July 22, 2023, Plaintiff Keviantae "Kev" Hill, 20 years old at the time, was enjoying attending the Lane County Fair for the first time with his friends when he was targeted by the Lane County Sheriff's Mounted Posse, an all-volunteer group of civilians dressed in cowboy hats and spurs, carrying pistols, and acting with police-like power but without police training, accountability, or oversight.

2.      As Mr. Hill entered the Fairgrounds, Posse members and private security singled him out, chased him out of the Fairgrounds and several blocks through a residential neighborhood, then used a golf cart to try to ram him down in the parking lot of Emmaus Lutheran Church while he was having an asthma attack. They forced him face-down to the ground, knelt on his back, and refused to let him sit up to breathe despite him saying he could not breath. Mr. Hill vomited red fluid. He begged for help. They offered none, until a concerned neighborhood mother arrived and demanded they stop the assault.

3.      The harm Mr. Hill suffered was not just physical: it was the product of a system that empowered civilians to play police, armed them, and turned them loose in public spaces with little guidance and no accountability, even after the Lane County Fair had experienced a shooting incident just two years prior. Mounted Posses have roots in some of the darkest parts of American history, from racist vigilante justice to modern-day militia movements. In Lane County, they remain active, uniformed, deputized, and in this case, unaccountable.

PAGE 2 – **COMPLAINT**

4.      Plaintiff Hill, a 22-year-old resident of Portland, brings this case against the Lane County Sheriff's Mounted Posse, involved Posse members, Lane County, involved Lane County Sheriff's Deputies, security company Iron Shield, LLC, involved Iron Shield employees, and the Lane County Fair Board for their role in causing the harms and losses suffered by Mr. Hill from which he is still recovering. He brings this action for compensatory and special damages, punitive damages, attorney's fees, and litigation costs.

## JURISDICTION

5.      This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. §§ 1983 and 12101 *et seq*., and 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

6.      Plaintiff requests this Court invoke its supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with respect to all causes of action based on Oregon law because the state claims arise from the same nucleus of operative facts as the federal claims.

## VENUE

7.      Venue is proper in the District of Oregon because the events giving rise to this claim occurred in this district, and all Defendants reside in this district.  28 U.S.C. §1391(b).

8.      Venue is proper in the Eugene Division because all events giving rise to Plaintiff's claims in this lawsuit took place in Eugene, Oregon. 28 U.S.C. § 1391(b)(2).

## PARTIES

9.      Plaintiff Keviante Hill is a Black man who, at all times relevant, was a resident of Portland, Multnomah County, Oregon. Mr. Hill was 20 years old at the time of the incident in question. He had just signed the lease on his first apartment, which he had negotiated and paid for himself. He went to Eugene to visit his friends and attend the Lane County Fair for the first time.

PAGE 3 – **COMPLAINT**

10.     Defendant Lane County is a municipal corporation and political subdivision of the State of Oregon, with its principal place of business located in Eugene, Lane County, Oregon. The Lane County Sheriff's Office is a department of Lane County.  At all times relevant, the Sheriff's Office acted through its agents, including its employees and the Lane County Sheriff's Mounted Posse, and was responsible for overseeing law enforcement services at public events, including the Lane County Fair. The Sheriff's Office formally engaged the Mounted Posse to assist with crowd control, traffic, and security-related functions at the Fair.

11.     Defendant Lane County Fair Board ("Fair Board") is a governmental entity established under ORS 565.210 and charged with organizing and managing the Lane County Fair, with its principal place of business located in Eugene, Lane County, Oregon. The Fair Board had control over the Lane Events Center property and was responsible for coordinating all aspects of security at the Fair. At all times relevant, the Fair Board contracted with and delegated public safety responsibilities to the Lane County Sheriff's Office, Lane County Sheriff's Mounted Posse, and private security firm Iron Sheild, LLC.

12.     Defendant Lane County Sheriff's Mounted Posse ("Mounted Posse") is an Oregon nonprofit corporation with its principal place of business in Eugene, Lane County, Oregon. Although organized as a separate legal entity, the Mounted Posse functions as an official auxiliary unit of the Lane County Sheriff's Office. The Mounted Posse maintains its own Public Benefit Entity with a principal place of business at the Lane County Sheriff's Office. The Posse members are required to submit applications through the Sheriff's Office and, upon information and belief, upon acceptance, are deputized by the Sheriff. While composed of civilian volunteers, Mounted Posse members wear uniforms, carry firearms, and act under the authority and color of law granted

PAGE 4 – **COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

by the Lane County Sheriff. The Mounted Posse often participate in equestrian events, ride horses in public, and wear uniforms reminiscent of cowboy attire including cowboy hats and boots with spurs. At all relevant times, the Mounted Posse performed law enforcement-related functions on behalf of Lane County and under its supervision, including providing armed patrol and security services at the Lane County Fair.

13.     Defendant Iron Shield, LLC was, at all times relevant, an Oregon limited liability company with its principal place of business in Springfield, Lane County, Oregon. Iron Shield was hired by the Lane County Fair Board to provide private security services at the Lane County Fair. Upon information and belief, Iron Shield was responsible for hiring, training, and supervising individual security personnel assigned to the Fair. Iron Shield security personnel acted jointly with, and under the direction of, public officials including the Lane County Sheriff's Office and the Mounted Posse.

14.     Defendant Steve Egeret was, at all relevant times, a member of the Lane County Sheriff's Mounted Posse. Defendant Egeret participated in the pursuit and physical detention of Plaintiff while armed and dressed in uniform. He acted under the color of state law and in coordination with law enforcement and contracted security personnel. At all times relevant, Egeret's actions were taken under the authority granted by the Lane County Sheriff and in furtherance of his assigned duties at the Fair.

15.     Defendant Levi McKenny was, at all relevant times, a Sergeant with the Lane County Sheriff's Office and the official liaison to the Mounted Posse. Defendant McKenny supervised and coordinated the activities of Posse members at the Lane County Fair. He acted under color of law and within the scope of his employment as a sworn law enforcement officer.

PAGE 5 – **COMPLAINT**

16.     Defendant Byron Trapp was, at all relevant times, a member of the Mounted Posse and a former Lane County Sheriff. While acting under the authority of the Mounted Posse and in coordination with Defendant McKenny, Trapp participated in the initial physical encounter with Plaintiff at the Fair. He acted under color of state law and in his capacity as a uniformed Posse member carrying out public safety duties at a government-run event.

17.     Defendant DOE 1 is an unidentified male individual who, on information and belief, was employed by Iron Shield, LLC and assigned to provide security at the Lane County Fair. At all times relevant, DOE 1 acted under the direction of or in concert with agents of the Lane County Sheriff's Office and the Mounted Posse, and participated in the unlawful pursuit, seizure, and use of force against Plaintiff. Therefore, DOE 1 was acting under color of law. Plaintiff will amend this complaint to identify Defendant DOE 1 when their identity becomes known.

## FACTS

### A.  Mr. Hill Attended the Lane County Fair with Friends in July 2023

18.      On July 22, 2023, Mr. Hill traveled with friends from Portland to Eugene to attend the Lane County Fair. The group consisted of Mr. Hill, his long-time friend from Portland, and his friend's girlfriend who lived in Eugene near the Lane Event Center. They had purchased tickets online and downloaded QR codes to their phones for admission. It was Mr. Hill's first time attending the Fair, and he was particularly excited to see the horses and other large animals and to enjoy the Fair's events and attractions.

19.     Between approximately 2:00 p.m. and 3:00 p.m., Mr. Hill and his friends arrived at the Fair's entrance near the intersection of West 16th Street and Friendly Street. They passed through security without issue and were not carrying bags.

PAGE 6 –**COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

20.    After passing through security, the group proceeded to the admissions booth and presented their QR code tickets to Fair staff. Each person received a hand stamp allowing re-entry. Mr. Hill and his friends encountered no problems at admissions.

21.    Once inside the Fairgrounds, Mr. Hill and his friends visited the animal barns, viewed the horses, purchased ride tickets, went on the Ferris wheel, and ate traditional fair food, including elephant ears and snow cones. Due to the afternoon heat, the group decided to head back to the friend's house a few blocks away and return in the evening when it was cooler. They walked to that friend's home to rest and wait.

22.    At approximately 9:30 p.m., Mr. Hill and his friends returned to the Fair through the same entrance. They again passed through security and admissions without incident, using their hand stamps for re-entry. They continued walking further into the Fair grounds.

**B. Mounted Posse Members and Iron Shield Security Guards Falsely Identify and Profile Mr. Hill Based on His Race Despite No Connection to Shooting Incident from Day Before**

23.    The day before Mr. Hill attended the Lane County Fair, a shooting occurred on or near the Fairgrounds. This was the second shooting incident at the Fair in the past two years.[1]

24.    Both the alleged shooter and the victim were reported to be persons of color. Neither individual had been taken into custody, although Defendant McKenny had directly

---

[1] *[ARCHIVED] Shots fired near Lane County Fair,* CITY OF EUGENE, https://www.eugene-or.gov/CivicAlerts.aspx?AID=6167&ARC=14306 (last visited Jul. 21, 2025).

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

interacted with the victim and obtained his full name, and the victim had been transported to the hospital. A witness described the individuals involved in the shooting as "boys." [2]

25.    The Eugene Police Department ("EPD") held primary jurisdiction over the Lane Event Center and was leading the investigation into the shooting. By July 22, 2023, both the shooter and victim were still at large.

26.    Upon information and belief, when Mr. Hill and his friends returned to the Fair on the evening of July 22, 2023, private security personnel employed by Defendant Iron Shield relayed information to members of the Mounted Posse suggesting that Mr. Hill, a young Black man, was a person involved in the shooting from the night before.

27.    In fact, Mr. Hill did not match the description of the suspected shooter or the victim. There was no evidence linking him to the incident. Mr. Hill had only arrived in Eugene that morning on July 22. Mr. Hill did not have any weapons and had no criminal history.

**C.  Mounted Posse Members and Iron Shield Security Guards Racially Profile Mr. Hill, Try to Grab Him, and Chase Him Out of the Fair Grounds**

28.    The Mounted Posse's responsibilities at the Fair were to ensure the flow of traffic, park vehicle, and help vehicles exit.

29.    Shortly after Mr. Hill and his friends re-entered the Fairgrounds that evening, Defendant Byron Trapp, a retired Lane County Sheriff and then-current Mounted Posse member,

---

[2] Ariel Iacobazzi & Albert James, *Shots fired near Lane County Fair, one person injured,* KEZI 9 NEWS (Jul. 21, 2023), https://www.kezi.com/news/shots-fired-near-lane-county-fair-one-person-injured/article_8dd7bbf0-284e-11ee-ae4d-27f7ad8a062c.html.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

and Defendant Levi McKenny, a Sergeant with the Lane County Sheriff's Office, drove a golf cart toward Mr. Hill and exited to approach him.

30.     Defendant McKenny later admitted that Mr. Hill "immediately caught my attention" because he was wearing "sweat style pants" and a "hooded sweatshirt."

31.     Defendant Trapp stated that he became "suspicious" of Mr. Hill because of his "dark-colored sweatpants and sweatshirt," and because his walk appeared "non-normal," which led him to speculate, without evidence, that Mr. Hill might be armed. Defendant Trapp also noted that the prior day's shooting involved "several late teen/young adults of Black and white races," a vague description that could have applied to the many thousands of other Fair goers that day.

32.     At all relevant times, Defendant McKenny acted as the liaison between the Lane County Sheriff's Office and the Mounted Posse and held supervisory authority over the Posse's activities at the Fair.

33.     Although Defendant McKenny was wearing a body camera, he chose not to activate the camera at any point during the interaction with Mr. Hill.

34.     Defendant McKenny was dressed in Mounted Posse clothing: a tan shirt, blue jeans, cowboy boots with spurs, and a visible gun on his belt. He was not wearing a standard Sheriff's Department uniform.

35.     As Mr. Hill walked through the Fairgrounds, Defendants McKenny and Trapp pointed flashlights at him and attempted to get his attention by calling out "hey" and "excuse me." They did not identify themselves as law enforcement or explain the reason for their approach.

36.     Without warning or legal justification, Defendant Trapp grabbed Mr. Hill's arm. Mr. Hill was startled and immediately turned and pulled away from the grip.

PAGE 9 – **COMPLAINT**

37.     Mr. Hill asked the strangers why they were attempting to grab him. Defendants did not respond with any explanation or lawful command and stated only that they "needed to talk to him."

38.     Defendants then attempted to grab Mr. Hill again. One of the Defendants placed a hand on their visible gun, threatening to escalate the situation with deadly force.

39.     Fearing for his safety and uncertain of who was confronting him or why, Mr. Hill ran back toward the Fair's main entrance at 16th Street and Friendly Street.

40.     As Mr. Hill exited through the gate, Fair staff members tried to grab him, but he pulled his arm away and continued running.

41.     Defendant McKenny admitted that members of the public attempted to assist Mr. Hill by closing a fence behind him to prevent the Mounted Posse from pursuing him. However, the fence was subsequently reopened to allow the armed Posse members to continue the chase.

42.     Mr. Hill ran through the parking lot and then onto a nearby public street heading back towards his friend's house to safety.

**D.  Mounted Posse Members and Iron Shield Security Guards Hunt Down Mr. Hill in a Golf Cart and Pin Him Down in a Church Parking Lot Until He Vomits Blood**

43.     Defendant Steve Egeret, a member of the Mounted Posse, and Defendant DOE 1, a private security guard employed by Iron Shield, chased Mr. Hill from the Fair grounds in a golf cart. During the pursuit, they repeatedly attempted to strike Mr. Hill with the vehicle.

44.     Upon information and belief, Defendant DOE 1 had been employed by Iron Shield for only four days at the time of the incident and had received minimal training.

PAGE 10 – **COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

45.    Mr. Hill has a diagnosed respiratory condition, asthma. After running several blocks from the Fairgrounds, he began experiencing an asthma attack. He slowed down and eventually came to a stop in the parking of Emmaus Lutheran Church, where he struggled to breath.

46.    Despite Mr. Hill's visible medical distress, Defendants Egeret and DOE 1 continued their pursuit and again attempted to ram him with the golf cart in the church parking lot. Mr. Hill narrowly avoided being struck.

47.    Mr. Hill dropped to his knees, unable to catch his breath.

48.    Defendants exited the golf cart and, without justification, tackled Mr. Hill to the ground, forcing him face-down.

49.    Defendant Egeret proceeded to kneel on Mr. Hill's back while holding Mr. Hill face down in a prone position in the church parking lot.

50.    Mr. Hill repeatedly informed Defendants that he was experiencing an asthma attack and could not breathe. Despite his clear distress and multiple verbal pleas, Defendants refused to loosen their hold or allow him to reposition himself to facilitate breathing.

51.    Mr. Hill pleaded to sit up or adjust his position so he could breathe more easily. Defendants denied or ignored his requests.

52.    Mr. Hill asked for permission to call someone. Defendants refused.

53.    Mr. Hill asked whether he was being detained. Defendants responded that he was not. Mr. Hill then asked whether he could leave. Defendants told him he could not.

54.    As Mr. Hill remained pinned to the ground, his breathing worsened. He cried out in pain and began vomiting red fluid while gasping for air.

PAGE 11 – **COMPLAINT**

55.     Defendants Egeret and DOE 1 did not call 911, call for backup, or seek medical assistance. They offered no first aid, refused to release Mr. Hill, and continued to hold him in a position that further restricted his ability to breathe.

56.     Defendants continued to hold Mr. Hill in a prone position, with a knee on his back, for an estimated five to ten minutes, during which time he was visibly experiencing a medical emergency and in need of urgent care.

**E.  Defendants Cease Their Use of Force Only After Witnesses Arrive and Begin Recording**

57.     After several minutes of being pinned face-down in the church parking lot, Mr. Hill's friends and one of their mothers arrived at the scene. Upon witnessing the incident, they began recording Defendants Egeret and DOE 1 with their phones and asked why Mr. Hill was being restrained.

58.     Only after witnesses arrived and began recording did Defendant Egeret remove his knee from Mr. Hill's back.

59.     At no point did Defendants Egeret or DOE 1 have legal authority to pursue, detain, or use force against Mr. Hill outside the Lane Event Center or on private property such as the Emmaus Lutheran Church grounds.

60.     Defendants contacted the Eugene Police Department during the incident. EPD informed them that Mr. Hill was not a suspect in the Fair-related shooting and that law enforcement had no interest in detaining him.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

61.     Despite receiving that instruction, Defendants Egeret and DOE 1 continued to unlawfully detain Mr. Hill. They photographed him without his consent while restraining him and without providing any explanation for the photographs.

62.     Defendant McKenny admitted that once it was confirmed Mr. Hill was not connected to the shooting, he still "made sure Egeret and the security officers knew [Mr. Hill] was to be let go, but to reiterate to him he was trespassed from returning to the Lane County Fair."

63.     Eventually, Defendants Egeret and DOE 1 told Mr. Hill he could get up. At that point, Mr. Hill was still in the midst of an asthma attack, had vomited, and was visibly shaking. He lost consciousness shortly after being released. Defendants did not provide or summon medical assistance at any time.

64.     Mr. Hill and his friends left the area. Mr. Hill continued to vomit and spit up blood for approximately two hours following the incident.

65.     Due to his physical condition and emotional distress, Mr. Hill was unable to work and called off his shift.

**F.  Defendants and Local Authorities Dismiss Community Complaints and Fail to Act on Evidence of Racially Motivated Abuse**

66.     The mother of Mr. Hill's Eugene friend later returned to the Fair and learned that Mr. Hill had been formally trespassed from the event. Staff at the Fair minimized or dismissed her concerns about the incident when questioned.

PAGE 13 – **COMPLAINT**

67.    Defendant McKenny later told her that he could have arrested Mr. Hill for "interfering with a peace officer." In fact, Mr. Hill had committed no crime, and there was no probable cause to support any such an arrest.

68.    Mr. Hill's Eugene friend and her mother submitted formal complaints alleging racial profiling and misconduct related to the Defendants' treatment of Mr. Hill. These complaints were ignored or dismissed by the agencies and individuals responsible for the Defendants' oversight.

69.    Mr. Hill timely served Tort Claim Notices on Lane County and the Lane County Sheriff's Office on August 24, 2023.

70.    Mr. Hill timely served a Tort Claim Notice on the Lane County Fair Board on September 13, 2023.

71.    Counsel for Mr. Hill also submitted a written notice of the incident and request to preserve evidence to the Lane County District Attorney's Office. District Attorney Patricia Perlow responded by stating she would dispose of the letter because she "had no place to store your letter" and that the prosecutor's office did not intend to take further action at that time.

72.    In contrast, several other government entities launched independent reviews of the incident. The Federal Bureau of Investigation ("FBI") initiated an investigation into potential criminal civil rights violations, including racial bias, by Defendants against Mr. Hill. Counsel for Mr. Hill offered to allow representatives from Lane County to participate in Mr. Hill's interview with the FBI, but Lane County declined to attend the interview to hear Mr. Hill's statement of events.

PAGE 14 –**COMPLAINT**

73.    The Oregon Department of Justice Civil Rights Unit conducted a review and documented that a racially motivated bias crime had occurred in connection with Defendants' actions.

74.    The City of Eugene issued a memorandum documenting numerous concerns with the conduct of Defendants, including:

a.    The failure to activate or wear body cameras;

b.    Confirmation that Mr. Hill did not match the description of any shooting suspect;

c.    Evidence that "EPD dispatch informed Fairground staff multiple times that they did not have the right individual and that they were not interested in pursuing that citizen. They continued with their pursuit and subsequent detention anyway,"

d.    That Defendants continued their pursuit and detention of Mr. Hill despite those instructions;

e.    That Defendants provided inconsistent and shifting justifications for their actions, first claiming Mr. Hill matched the shooting suspect, then the victim, then a third-party instigator;

f.    That the Mounted Posse exceeded the lawful scope of their jurisdiction by pursuing Mr. Hill off Fairgrounds property; and

g.    That Mounted Posse members, though civilian volunteers, were armed and acting in a law enforcement capacity without appropriate oversight.

75.    These collective failures by Defendants, from ignoring community complaints to refusing to investigate or even listen to clear evidence of racial profiling, reflect a systemic

PAGE 15 – **COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

breakdown of oversight and accountability that enabled the Defendants' unlawful conduct to go unchecked.

### G. The Lane County Sheriff's Mounted Posse Stems from Racist and Extremist Origins That Continue to Influence Its Operation

76.    The Lane County Sheriff's Mounted Posse is a modern-day extension of the historical *posse comitatus*, a legal doctrine originating in medieval England which empowered sheriffs to summon civilians to enforce the law. The Sheriff's Act of 1887 formally codified this power.

77.    In the United States, *posse comitatus* was adopted in the 19th century and often used to advance violent, racially motivated agendas. Armed posses were involved in acts of vigilante justice, including the 1897 Lattimer Massacre, where immigrant coal miners were killed, and in the lynchings of Black Americans throughout the late 1800s and early 20th century.

78.    In the 1960s and 1970s, the *Posse Comitatus* movement re-emerged as a far-right, white supremacist movement. Two of its most prominent figures, William Potter Gale and Henry L. "Mike" Beach, had direct ties to Oregon. Gale was born and raised in Oregon, and Beach lived in Portland and had belonged to the Silver Shirts, a fascist and antisemitic organization active in the 1920s and 1930s.

79.    The modern *Posse Comitatus* movement advanced white Christian nationalist ideologies. Its adherents rejected federal authority, promoted antisemitic conspiracy theories, and asserted that county sheriffs were the highest form of legal authority above even the federal judiciary.

PAGE 16 – **COMPLAINT**

80.     Beginning in the 1970s, the *posse comitatus* movement in Oregon gave rise to a pattern of extremist, unlawful conduct that reflected a fundamental hostility toward lawful government authority. Posse groups in Oregon counties, including Lane, Umatilla, and Josephine, organized unauthorized "citizens' grand juries," attempted to indict and arrest elected officials, and engaged in armed intimidation. Specific incidents include a Posse member bringing a rifle to a public land-use meeting in Portland, the occupation of a private farm structure by seven armed men in Umatilla County in 1976, and the filing of a $150 million lawsuit by a Josephine County Posse member accusing state officials, including the governor and Oregon Supreme Court justices, of conspiracy and demanding their arrest. In 1985, FBI raids were launched in Portland in response to credible threats of murder-arson threats by Posse members against judges. These activities demonstrate a history of vigilante conduct, legal harassment, and disregard for lawful authority, providing critical context for understanding the origins of Posse groups, including the Lane County Sheriff's Mounted Posse.

81.     Lane County Sheriff's Mounted Posse arose during the heart of the *posse comitatus* extremist movement. Lane County maintained an informal posse as early as 1941. However, the Lane County Sheriff's Mounted Posse was formally incorporated as a nonprofit entity on November 2, 1973. That same year, the Lane County Sheriff's Mounted Posse founded what is believed to be the first "citizens' grand jury" in the United States, an extrajudicial body convened by civilians to target government officials without legal oversight. These types of proceedings have since been associated with extremist movements, including attempts to indict government officials following the 2016 armed occupation of the Malheur National Wildlife Refuge.

PAGE 17 – **COMPLAINT**

82.    Lane County's Mounted Posse also formed at a time of extreme racism and discrimination against Black Oregonians. Lane County, and Oregon broadly, has a deep-rooted history of institutional racism and white supremacy spanning back to the mid-1800s. From the state's founding, Oregon codified Black exclusion laws that banned African Americans from settling, with threats of whipping and forced removal until as late as 1926. By the 1920s, Oregon became a stronghold for the Ku Klux Klan, with membership estimated at over 35,000 statewide and active local chapters in communities like Eugene and Lane County. In 1922, state senator Walter M. Pierce, who supported Klan-backed measures like the anti-Catholic Compulsory School Bill, was elected governor with explicit support from the KKK. Klan officer Rufus C. Holman held public office in Lane County before being appointed Oregon State Treasurer (1931–38) and later U.S. Senator (1939–45).

83.    The Klan wielded substantial political power, electing sympathetic officials, passing restrictive laws against Catholics and immigrants, and conducting public displays of hatred, cross burnings, parades, and intimidation tactics, all targeting Black, Catholic, Jewish, immigrant, and other minority groups. Eugene was a notorious "sundown town," forcibly keeping Black people out via legal and violent means, while landmark safe havens like the Mims House[3] emerged later to resist this oppression. In 1922, Klan-backed candidates won a majority of Eugene City Council seats. This victory led to the resignations of numerous city officials, including the mayor, the police chief, and the city attorney, all Catholics, further embedding Klan influence within local government and law. Dr. Frederick Stanley Dunn, head of the University of Oregon's

---

[3] Nisha Burton, *Finding Home at the Mims*, OREGON HUMANITIES (Sept. 11, 2017), https://oregonhumanities.org/rll/beyond-the-margins/finding-home-at-the-mims/.

PAGE 18 – **COMPLAINT**

Latin Department, was also the "Exalted Cyclops" (leader) of Eugene Klan No. 3. His dual roles underscore a close nexus between academic, municipal, and Klan power structures.

84.     Lane County law enforcement directly aided the rise and influence of the Ku Klux Klan and its racist agenda. In the 1920s, Oregon had the highest KKK membership per capita in the United States, and Eugene had a strong rural chapter. The Eugene Klan chapter marched openly through downtown and burned crosses on Skinner Butte.

85.     This legacy of exclusion, terror, and exclusionary policy in Lane County's past provides critical context for understanding how local law-enforcement–affiliated groups like the Mounted Posse share organizational antecedents with broader vigilantism and racist movements in the region.

86.     Today, members of the Lane County Sheriff's Mounted Posse are civilian volunteers. They wear uniforms and badges that resemble official law enforcement attire and may carry firearms if they are licensed concealed handgun holders or retired peace officers. The Lane County Sheriff's Mounted Posse posts photos of its members engaging in firearms target shooting on its social media pages. Mounted Posse members are required to own a horse and participate in public events, including security operations.

87.     Despite their appearance and official affiliation, Mounted Posse members generally do not have arrest powers or legal authority to enforce the law. Nevertheless, they are regularly deployed in public spaces in law enforcement-like roles, like Fair security, with minimal training and little oversight, often while carrying firearms and riding horses or vehicles.

88.     The legacy and structure of the Lane County Sheriff's Mounted Posse reflect the dangers of arming and deputizing civilians to operate in public-facing, quasi-policing roles without

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

clear limitations. The unconstitutional detention and use of force against Mr. Hill is the foreseeable result of this structure, and one that continues to place members of the public, particularly communities of color, at risk.

## FIRST CLAIM FOR RELIEF

### Violations of 42 U.S.C. § 1983 – 4th Amendment – Unlawful Seizure/False Arrest
*(Against Defendants Egeret, McKenny, Trapp, DOE 1, Lane County, and*
*Lane County Sheriff's Mounted Posse)*

89.     Plaintiff realleges all previous paragraphs.

90.     At all times relevant, Defendants Egeret, McKenny, Trapp, and DOE 1 were acting under color of state law and within the scope of authority delegated by Lane County and/or the Lane County Sheriff's Office.

91.     These individual Defendants unlawfully seized Plaintiff's person without a warrant, probable cause, or reasonable suspicion, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

92.     Defendants seized Plaintiff by:

   a.   Physically grabbing his arm without identifying themselves or articulating lawful cause;

   b.   Pursuing him in a golf cart after he fled in fear;

   c.   Tackling and pinning him to the ground while he experienced a medical emergency; and

   d.   Preventing him from leaving while stating he was not under arrest.

93.     A reasonable person in Plaintiff's position would not have felt free to leave. The seizure was accomplished through physical force, display of authority, and denial of movement.

PAGE 20 – **COMPLAINT**

94.    The seizure was objectively unreasonable under the totality of the circumstances, particularly given that:

    a.    Plaintiff was not suspected of any crime;

    b.    EPD had advised Fair personnel that Plaintiff was not a suspect;

    c.    Defendants failed to identify themselves;

    d.    The force used was excessive and caused physical and emotional harm.

95.    Defendants Lane County and the Lane County Sheriff's Mounted Posse are liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), because:

    a.    They maintained customs, policies, or practices that permitted untrained, armed civilian volunteers to conduct law enforcement functions;

    b.    They failed to adequately train or supervise Defendants in lawful seizure protocols; and

    c.    They were deliberately indifferent to the known risk that such misconduct would occur.

96.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered physical injury, including complications from an asthma attack and vomiting blood; emotional distress, fear, anxiety, loss of dignity, and humiliation; and economic loss, including missed work and medical care.

97.    Defendants Lane County and Lane County Sheriff's Mounted Posse's were deliberately indifferent to the known or obvious consequences of its failure to train its employees and agents.

PAGE 21 –**COMPLAINT**

98.    The failure of Defendants Lane County and Lane County Sheriff's Mounted Posse's to provide adequate training and prevent violations of law by its employees or agents caused the deprivation of Plaintiff's rights by Defendants Egeret, McKenny, and Trapp.

99.    Defendants Lane County and Lane County Sheriff's Mounted Posse's failure to adequately train its employees and agents played a substantial part in bringing about or actually causing injury to Plaintiff.

100.    Accordingly, Plaintiff seeks economic and noneconomic damages in an amount to be determined at trial.

101.    The acts of the individual Defendants were intentional, willful, and in reckless disregard of Plaintiff's constitutional rights. Plaintiff seeks punitive damages against them in an amount to be determined by a jury.

102.    Plaintiff seeks an award of his reasonable attorney fees and costs pursuant to incurred in bringing this action pursuant to 42 U.S.C. § 1988(b).

103.    Plaintiff is entitled to a prevailing party fee, his costs, and disbursements.

### SECOND CLAIM FOR RELIEF

**Violations of 42 U.S.C. § 1983 – 4th Amendment – Excessive Use of Force**
***(Against Defendants Egeret, DOE 1, Lane County, and
Lane County Sheriff's Mounted Posse)***

104.    Plaintiff realleges all previous paragraphs.

105.    At all relevant times, Defendants Egeret and DOE 1 were acting under the color of state law and pursuant to authority granted by Lane County and the Lane County Sheriff's Office.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

106.    Defendants Egeret and DOE 1 used force against Plaintiff that was excessive, unreasonable, and in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Specifically, the excessive force included:

    a.    Pursuing Mr. Hill in a golf cart and attempting to strike him with the vehicle;

    b.    Tackling Mr. Hill to the ground after he had stopped running and was experiencing a medical emergency;

    c.    Pinning Mr. Hill face-down while he suffered an asthma attack;

    d.    Kneeling on Mr. Hill's back while he pleaded for help, vomited blood, and stated that he could not breathe; and

    e.    Refusing to allow Mr. Hill to reposition himself or receive medical assistance despite his visible and audible distress.

107.    Defendants purposefully or knowingly used forced against Plaintiff.

108.    The use of force was objectively unreasonable under the circumstances, including that Mr. Hill posed no threat to Defendants or the public; was unarmed, not resisting, and in medical distress; EPD had informed Defendants that Mr. Hill was not suspected of any crime; and the use of force continued long after any arguable justification had ceased to exist.

109.    As a direct and proximate result of Defendants' use of excessive force, Mr. Hill suffered physical injury, including complications from an asthma attack and vomiting blood; ongoing pain, fear, and trauma; emotional distress and psychological harm; loss of dignity; and economic loss, including time off work and medical expenses.

110.    Defendant Lane County and the Lane County Sheriff's Mounted Posse are liable under *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978), in that they:

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

a.  Maintained policies, customs, or practices of deploying armed volunteers in law enforcement roles without adequate training;

b.  Failed to train or supervise agents and volunteers in the lawful and safe use of force; and

c.  Were deliberately indifferent to the foreseeable consequences of authorizing unqualified individuals to engage in policing activities at public events.

111.   The failure of Defendants Lane County and Lane County Sheriff's Mounted Posse to provide adequate training and prevent violations of law by its employees or agents caused the deprivation of Plaintiff's rights by Defendants. The failure to train and supervise Defendants Egeret and DOE 1 was a moving force behind the constitutional violations suffered by Mr. Hill.

112.   Plaintiff seeks economic and noneconomic damages in an amount to be determined at trial.

113.   The acts of the individual Defendants were intentional, willful, and in reckless disregard of Plaintiff's constitutional rights. Plaintiff seeks punitive damages against them in an amount to be determined by a jury.

114.   Plaintiff seeks an award of his reasonable attorney fees and costs pursuant to incurred in bringing this action pursuant to 42 U.S.C. § 1988(b).

115.   Plaintiff is entitled to a prevailing party fee, his costs, and disbursements.

### THIRD CLAIM FOR RELIEF

**Violations of ORS 30.198 – Bias Crime in the First or Second Degree**
*(Against Defendants Egeret, McKenny, Trapp, and DOE 1)*

116.   Plaintiff realleges all paragraphs.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

Case 6:25-cv-01290-MC    Document 1    Filed 07/22/25    Page 25 of 37

117.    At all relevant times, Defendants Egeret, McKenny, Trapp, and DOE 1 acted individually and in concert to subject Plaintiff to unlawful treatment motivated, in whole or in part, by Plaintiff's race and/or perceived race as a young Black man.

118.    Defendants' conduct constitutes bias crimes in the first and second degree as defined in ORS 166.165 and ORS 166.155, giving rise to civil liability under ORS 30.198.

119.    Specifically, Defendants engaged in the following conduct motivated by racial bias:

a.    Intentionally, knowingly, or recklessly causing physical injury to Plaintiff by attempting to strike him with a golf cart, tackling him, pinning him face-down while he was experiencing a medical emergency, and kneeling on his back while he cried out for help.

b.    Acting with criminal negligence by causing physical injury by attempting to ram Plaintiff with a golf cart, a motorized vehicle capable of causing serious harm, in violation of ORS 166.165(1)(a);

c.    Intentionally placing Plaintiff in fear of imminent serious physical injury by chasing him, attempting to grab him, and threatening him through their physical conduct while armed and acting without legal justification; and

d.    Intentionally alarming Plaintiff by threatening to inflict serious physical injury upon Plaintiff in their pursuit, restraint, and refusal to disengage despite Plaintiff's distress.

120.    As a direct and proximate cause of Defendants' actions, Mr. Hill suffered physical injury, including complications from an asthma attack and vomiting blood; ongoing pain, fear, and

PAGE 25 –**COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

trauma; emotional distress and psychological harm; loss of dignity; and economic loss, including time off work and medical expenses.

121.    Plaintiff seeks economic and noneconomic, general and special damages in an amount to be determined at trial, as authorized under ORS 30.198(2)(a).

122.    The individual Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights.  The individual Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future pursuant to ORS 30.198(2)(b).

123.    Plaintiff seeks an award of his reasonable attorney fees and costs incurred in bringing this action pursuant to ORS 30.198(3).

124.    Plaintiff is entitled to a prevailing party fee, his costs and his disbursements.

## FOURTH CLAIM FOR RELIEF

### Battery
### *(Against All Defendants)*

125.    Plaintiff realleges all previous paragraphs.

126.    Under Oregon law, battery is the intentional and harmful or offensive contact with another person without legal justification or consent.

127.    Defendants McKenny and Trapp intentionally made physical contact with Plaintiff by grabbing his arm without consent and without lawful justification while attempting to detain him at the Lane County Fair.

128.    This contact was harmful and offensive to a reasonable person and to Mr. Hill.

PAGE 26 –**COMPLAINT**

129.    Defendants Egeret and DOE 1 intentionally attempted to ram Plaintiff with a golf cart, and then tackled him to the ground, held him face-down, and knelt on his back while he was experiencing an asthma attack.

130.    These actions were undertaken without legal justification and involved harmful and offensive contact, particularly in light of Plaintiff's visible medical distress. This contact was harmful and offensive to a reasonable person and to Mr. Hill.

131.    At all times relevant, the individual Defendants were acting within the course and scope of their employment or role with Defendants Lane County, Lane County Sheriff's Mounted Posse, and Iron Shield.

132.    The entity Defendants are vicariously liable under *respondeat superior* principles for the acts and omissions of the individual Defendants acting in such course and scope of their employment or role with the entity Defendants and acting in furtherance of serving the interests of the entity Defendants.

133.    Plaintiff provided Defendant Lane County with a timely Tort Claims Notice.

134.    As a direct and proximate cause of Defendants' actions, Mr. Hill suffered physical injury, including complications from an asthma attack and vomiting blood; ongoing pain, fear, and trauma; emotional distress and psychological harm; loss of dignity; and economic loss, including time off work and medical expenses.

135.    Plaintiff seeks economic and noneconomic, general and special damages in an amount to be determined at trial.

PAGE 27 – **COMPLAINT**

136.    The individual Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights.  The individual Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

137.    Plaintiff is entitled to a prevailing party fee, his costs and his disbursements.

## FIFTH CLAIM FOR RELIEF

### Assault
### *(Against All Defendants)*

138.    Plaintiff realleges all previous paragraphs.

139.    Under Oregon law, assault occurs when a person intentionally engages in conduct that creates in another person a reasonable apprehension of imminent harmful or offensive contact.

140.    Defendants McKenny and Trapp intentionally approached and attempted to grab Plaintiff without cause or explanation while wearing cowboy-style clothing and displaying a firearm. They failed to identify themselves or provide any lawful basis for their actions.

141.    Defendants McKenny and Trapp's actions caused Plaintiff to reasonably fear that he would be subjected to harmful or offensive physical contact. Plaintiff experienced imminent apprehension and distress due to their aggressive behavior, use of force, and display of armed authority.

142.    Defendants Egeret and DOE 1 intensified that fear by pursuing Plaintiff in a golf cart, attempting to strike him with the vehicle, and physically tackling and restraining him while he was in medical crisis.

PAGE 28 –**COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

143.    Defendants Egeret and DOE 1's conduct was intentional and caused Plaintiff to experience immediate fear of serious injury or death, particularly in light of their armed status and refusal to stop despite his pleas for help and medical distress.

144.    The conduct of all individual Defendants would be offensive to a reasonable person, was offensive to Mr. Hill, and was undertaken without lawful justification.

145.    At all times relevant, the individual Defendants were acting within the course and scope of their employment or role with Defendants Lane County, Lane County Sheriff's Mounted Posse, and Iron Shield.

146.    The entity Defendants are vicariously liable under *respondeat superior* principles for the negligent acts and omissions of the individual Defendants acting in such course and scope of their employment or role with the entity Defendants and acting in furtherance of serving the interests of the entity Defendants.

147.    Plaintiff provided Defendant Lane County with a timely Tort Claims Notice.

148.    As a direct and proximate cause of Defendants' actions, Mr. Hill suffered physical injury, including complications from an asthma attack and vomiting blood; ongoing pain, fear, and trauma; emotional distress and psychological harm; loss of dignity; and economic loss, including time off work and medical expenses.

149.    Plaintiff seeks economic and noneconomic, general and special damages in an amount to be determined at trial.

150.    The individual Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights. The individual Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

PAGE 29 –**COMPLAINT**

151.    Plaintiff is entitled to a prevailing party fee, his costs and his disbursements.

### SIXTH CLAIM FOR RELIEF

#### Negligence Per Se – Violations of ORS 161.233
##### *(Against All Defendants)*

152.    Plaintiff realleges all previous paragraphs.

153.    Under Oregon law, including ORS 27.020(1)(a), a plaintiff may rely on the negligence *per se* doctrine when a statutory violation causes an injury to the class of person the statute was intended to protect, and the injury is of the kind the statute sought to prevent.

154.    Under Oregon law, ORS 161.015 and ORS 133.005, police officers are "peace officers."

155.    ORS 161.233(3), enacted by the Oregon Legislature after and in response to the George Floyd murder and protests, expresses and defines the standard of care that peace officers must comply with before using physical force, if they had a reasonable opportunity to do so. It requires that a peace officer may only use physical force upon another person when it is objectively reasonable under the totality of the circumstances for the peace officer to believe that:

    a.    The person poses an imminent threat of physical injury to the peace officer or to a third person; or

    b.    The use of physical force is necessary to make a lawful arrest when the peace officer has probable cause to believe the person has committed a crime, or, to prevent the escape from custody of the person when the peace officer has probable cause to believe the person has committed a crime.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

156.    The law also requires that prior to using physical force upon another person, if the peace officer has a reasonable opportunity to do so, the peace officer shall:

    a.    Consider alternatives such as verbal de-escalation, waiting or using other available resources and techniques if reasonable, safe and feasible; and

    b.    Give a verbal warning to the person that physical force may be used and provide the person with a reasonable opportunity to comply.

157.    Defendants Egeret, McKenny, Trapp, and DOE I acted as, or with the authority of, peace officers under Oregon law and are subject to the requirements of ORS 161.233.

158.    Defendants used physical force on Mr. Hill, including grabbing him, attempting to ram him with a golf cart, tackling him and forcing him to the ground, kneeling on his back, and pinning him to the ground in a prone position for several minutes while he was experiencing a medical emergency.

159.    Defendants violated ORS 161.233 by using physical force on Mr. Hill under circumstances in which Mr. Hill did not pose an imminent threat of physical injury to the peace officer or to a third person, there was no probable cause to believe Mr. Hill had committed any crime, and there were no grounds to make a lawful arrest of Mr. Hill.

160.    Defendants further violated ORS 161.233 by failing to consider alternatives that did not use force, failing to de-escalate the situation including by failing to cease using force or pursuing Mr. Hill outside the Fairgrounds, failing to wait for backup or a law enforcement officer, failing to disengage upon learning from EPD that Mr. Hill was not a criminal suspect, failing to give Mr. Hill a warning that physical force would be used, and failing to provide Mr. Hill a reasonable opportunity to comply, despite Defendants having a reasonable opportunity to do so.

PAGE 31 –**COMPLAINT**

161.    ORS 161.233 is designed to protect civilians from unreasonable use of force by peace officers, and Mr. Hill is within that intended class of persons to be protected.

162.    The type of harm suffered by Mr. Hill, including physical injuries and medical distress and pain and suffering resulting from excessive force, is precisely the type of harm ORS 161.233 was intended to prevent.

163.    Defendants' statutory violations establish negligence per se, replacing the need to show a common-law breach of duty.

164.    The entity Defendants are vicariously liable under *respondeat superior* principles for the negligent acts and omissions of the individual Defendants acting in such course and scope of their employment or role with the entity Defendants and acting in furtherance of serving the interests of the entity Defendants.

165.    Plaintiff provided Defendant Lane County with a timely Tort Claims Notice.

166.    As a direct and proximate cause of Defendants' actions, Mr. Hill suffered physical injury, including complications from an asthma attack and vomiting blood; ongoing pain, fear, and trauma; emotional distress and psychological harm; loss of dignity; and economic loss, including time off work and medical expenses.

167.    Plaintiff seeks economic and noneconomic, general and special damages in an amount to be determined at trial.

168.    The individual Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights.  The individual Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

169.    Plaintiff is entitled to a prevailing party fee, his costs and his disbursements.

PAGE 32 –**COMPLAINT**

## SEVENTH CLAIM FOR RELIEF

### Negligence
### *(Against All Defendants)*

170.    Plaintiff realleges all previous paragraphs.

171.    Each Defendant owed Plaintiff a duty to exercise reasonable care in hiring, training, supervising, and retaining agents, contractors, deputies, or volunteers tasked with providing public safety, event security, or law enforcement-adjacent functions at the Lane County Fair.

### *Negligence – Lane County Defendants*

172.    Defendant Lane County breached its duty of care by failing to:

   a.    Adequately train and supervise Mounted Posse members tasked with public-facing security;

   b.    Establish reasonable limits or oversight regarding the authority and use of force by the Mounted Posse; and

   c.    Prevent foreseeable misuse of force and false detention by individuals acting under its color of law.

173.    Defendant Lane County knew or should have known that its failure to train and supervise personnel like Defendants McKenny, Egeret, and Trapp would result in unlawful uses of force, unauthorized detentions, and racially discriminatory treatment.

174.    Lane County's negligence was unreasonable in light of the foreseeable risk that inadequately managed personnel would harm civilians, especially in a crowded public venue with children and youth of color present.

PAGE 33 –**COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

175.    Defendant Lane County's negligence was a substantial factor in causing Plaintiff's physical, emotional, and economic harm.

### *Negligence – Lane County Sheriff's Mounted Posse Defendants*

176.    Defendant Lane County Sheriff's Mounted Posse breached its duty of care by:

a.  Accepting roles in public security and policing functions without ensuring members were adequately trained; and

b.  Permitting members to act with the appearance of law enforcement authority, including carrying firearms and restraining civilians, without lawful basis or safeguards.

177.    Defendant Mounted Posse knew or should have known that its volunteer structure, lack of formal law enforcement training, and quasi-official posture created a foreseeable risk of excessive force and racial profiling.

178.    This negligence directly and proximately caused Plaintiff to suffer injury and trauma, including an asthma attack, emotional distress, and lasting psychological harm.

### *Negligence – Lane County Fair Board*

179.    Defendant Lane County Fair Board was negligent in:

a.  Failing to develop and implement an adequate security plan;

b.  Hiring and relying on inadequately trained or supervised entities (including the Mounted Posse and Iron Shield) to provide crowd control and law enforcement-like services; and

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

    c.   Failing to ensure lawful, non-discriminatory treatment of attendees by its contractors and security agents.

180.    These failures created a foreseeable risk of harm to patrons of the Fair, especially Black youth like Mr. Hill, and were a substantial factor in the harms he suffered.

### *Negligence – Iron Shield, LLC and DOE 1*

181.    Defendant Iron Shield, LLC breached its duty of care by:

    a.   Hiring unqualified security personnel, including Defendant DOE 1;

    b.   Failing to train or supervise its employees on use-of-force limitations, racial bias, and appropriate escalation protocols;

    c.   Permitting its security staff to act beyond their authority, including pursuing and detaining individuals outside the Fairgrounds.

182.    Iron Shield's conduct was a substantial factor in causing Plaintiff's injuries, and the resulting emotional and financial harms.

183.    At all times, the individual Defendants were acting within the course and scope of their roles as employees, agents, or volunteers of Lane County, the Mounted Posse, Iron Shield, or the Fair Board.

184.    The entity Defendants are vicariously liable under *respondeat superior* principles for the negligent acts and omissions of the individual Defendants acting in such course and scope of their employment or role with the entity Defendants and acting in furtherance of serving the interests of the entity Defendants.

PAGE 35 –**COMPLAINT**

185.     Plaintiff provided Defendants Lane County and Lane County Fair Board with timely Tort Claims Notices.

186.     As a direct and proximate cause of Defendants' actions, Mr. Hill suffered physical injury, including complications from an asthma attack and vomiting blood; ongoing pain, fear, and trauma; emotional distress and psychological harm; loss of dignity; and economic loss, including time off work and medical expenses.

187.     Plaintiff seeks economic and noneconomic, general and special damages in an amount to be determined at trial.

188.     The individual Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights.  The individual Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

189.     Plaintiff is entitled to a prevailing party fee, his costs and his disbursements.

### DEMAND FOR JURY TRIAL

190.     Plaintiff demands a jury trial on all issues so triable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the Court enter judgment in his favor and against all Defendants, and award the following relief:

a.   A declaration that Defendants McKenny, Egeret, Trapp, and DOE 1 violated Plaintiff's rights under the United States Constitution and Oregon law, including but not limited to rights protected by the Fourth and Fourteenth Amendments and ORS 30.198;

PAGE 36 –**COMPLAINT**

b.  An award of general and compensatory damages in an amount to be proven at trial, for Plaintiff's physical injuries, pain and suffering, emotional distress, trauma, humiliation, and loss of dignity;

c.  An award of special damages in an amount according to proof, including but not limited to lost wages and out-of-pocket expenses;

d.  An award of economic damages for Plaintiff's past and future medical care, mental health treatment, and related expenses in an amount to be determined at trial;

e.  An award of punitive damages against each individual Defendant whose acts were intentional, malicious, or taken with reckless indifference to Plaintiff's federally and state-protected rights;

f.  An award of Plaintiff's reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), ORS 30.198(3), and any other applicable statute or rule;

g.  An award of interest on all sums awarded, including prejudgment and post-judgment interest as permitted by law; and

h.  Such other and further relief as this Court deems just, equitable, and appropriate.

DATED:  July 22, 2025                          LeDuc Montgomery LLC

                                               By: _s/Alicia LeDuc Montgomery_____
                                               **Alicia LeDuc Montgomery, OSB #173963**
                                               alicia@leducmontgomery.com
                                               (704) 702-6934

                                               **Jesse Merrithew, OSB #074564**
                                               jesse@lmhlegal.com
                                               (971) 554-7092

                                               Attorneys for Plaintiff Kevianate Hill

PAGE 37 – **COMPLAINT**